# UNITED STATES DISTRICT COURT

for the

Southern District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Apple iPhone<br>Seized as FP&F No. 2022565200006601 Item 002<br>("Target Device 1") | Case No.  '22 MJ03543 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-1, incorporated herein by reference.

located in the  Southern  District of  California , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 8 USC 1324(a)(1)(A)(ii) & (v)(i) | ALIEN SMUGGLING and CONSPIRACY TO ALIEN SMUGGLE |
| 31 USC 5332 | BULK CASH SMUGGLING |
| 8 USC 2 | AIDING AND ABETTING |

The application is based on these facts:

See Attached Affidavit of Alexander R. Djokich, U.S. Border Patrol Agent, incorporated herein by reference.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days: _____)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*/s/ Alexander Djokich*
*Applicant's signature*

Alexander R. Djokich, Border Patrol Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by  telephone  *(specify reliable electronic means)*

Date:  09/27/2022 

*Judge's signature*

City and state:  San Diego, California   Hon. Andrew G. Schopler, U.S. Magistrate Judge
*Printed name and title*

## **ATTACHMENT A-1**
PROPERTY TO BE SEARCHED

Authorization to search for evidence described in Attachment B includes the search of disks, memory and SIM cards, deleted data, remnant data, slack space and temporary or permanent files contained on or in the cellular telephone:

    Apple iPhone
    Seized as FP&F No. 2022565200006601 Item 002
    ("Target Device 1")

    Target Device 1 is currently being stored at the U.S. Border Patrol's Asset Forfeiture Office located at 311 Athey Avenue, San Ysidro, California 92173.

SW Application Attachment B

ATTACHMENT B
ITEMS TO BE SEIZED

Authorization to search the cellular telephones described in Attachments A-1 and A-2 includes the search of disks, memory cards, deleted data, remnant data, slack space and temporary or permanent files contained on or in the cellular telephones for evidence described below. The seizure and search of the cellular telephones shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the cellular telephones will be electronic records, communications, and data such as emails, text messages, chats and chat logs including from various third party applications, photographs, audio files, videos, document files, and location data for the period of February 28, 2022 up to and including July 5, 2022:

a. tending to indicate efforts to transport non-citizens without legal status from outside the United States into and throughout the United States;

b. tending to identify other facilities, storage devices, or services such as email addresses, IP addresses, and phone numbers that may contain electronic evidence of efforts to transport non-citizens without legal status from outside the United States into and throughout the United States, as well as evidence of the transportation of alien smuggling proceeds throughout the United States and into Mexico;

c. tending to identify co-conspirators, criminal associates, or others involved in the transporting of non-citizens without legal status from outside the United States into and throughout the United States, and of alien smuggling proceeds throughout the United States and into Mexico;

d. tending to identify travel to or presence at locations such as stash houses, load houses, or delivery points involved in the transporting of non-citizens without legal status from Mexico to the United States or throughout the United States and transporting of alien smuggling proceeds throughout the United States and into Mexico;

e. tending to identify the user of, or persons with control over or access to, the subject phone; or

f.  tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data above,

which are evidence of violations of Title 8, United States Code, Sections 1324(a)(1)(A)(ii)(transportation of certain aliens) and (v)(I) (conspiracy to transport certain aliens),  Title 31, United States Code, Section 5332 (bulk cash smuggling), and Title 18, United States Code, Section 2 (aiding and abetting).

# AFFIDAVIT

I, Alexander Djokich, being duly sworn, hereby state as follows:

## INTRODUCTION

1. I submit this affidavit in support of an application for a warrant to search the following electronic devices:

> Apple iPhone
> Seized as FP&F No. 2022565200006601 Item 002 ("Target Device 1")
>
> Motorola Cell Phone
> Seized as FP&F No. 2022565200006601 Item 003 ("Target Device 2")

as further described in Attachments A-1 and A-2, and to seize evidence of crime, specifically, violations of Title 8, United States Code, Sections 1324(a)(1)(A)(ii)(transportation of certain aliens) and (v)(I) (conspiracy to transport certain aliens), and Title 31, United States Code, Section 5332 (bulk cash smuggling) and Title 18, United States Code, Section 2 (aiding and abetting), as further described in Attachment B.

2. The requested warrant relates to the investigation of Israel VALDEZ-Felix for transportation of non-citizen aliens within the United States, conspiracy to commit the same, and aiding and abetting bulk cash smuggling. The **Target Devices** are currently in the custody of Department of Homeland Security, Customs and Border Protection, United States Border Patrol, San Diego Sector at 311 Athey Avenue, San Ysidro, California, 92173.

3. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses, including my review of reports prepared by other law

enforcement officers and agents. This affidavit is intended to show that there is sufficient probable cause for the requested warrants and does not purport to set forth all of my knowledge of the investigation into this matter. Dates and times are approximate.

## TRAINING AND EXPERIENCE

4.  I am a Border Patrol Agent with U.S. Customs and Border Protection, United Sates Border Patrol (USBP), and have been so employed since February of 2006. I am assigned to the Imperial Beach Border Patrol (IMB) Station's Targeted Enforcement Unit (TEU) and preform the majority of my duties within the IMB Station's area of reasonability (AOR). I attended USBP basic Border Patrol Training Academy at the Federal Law Enforcement Training Center in Artesia, New Mexico and graduated in July of 2006. The Academy curriculum incorporated specialized training in the Immigration and Naturalization Act ("INA"), statutory authority, and criminal law, including cross training in Title 21 of the United States Code (Controlled Substance Act ("CSA") violations) and Title 19 of the United States Code (Customs law violations).

5.  During the tenure of my employment with the USBP I have patrolled the United States/Mexico International Boundary to prevent the illegal entry of aliens and/or contraband.  I have arrested individuals in violation of immigration law and other applicable federal and state laws.  During my time on patrol duties, I was involved in preparing and submitting cases, reports and evidence for administrative and criminal proceedings regarding the violation of immigration law and CSA violations.

6.  I have been assigned to USBP units that operate in plain-clothes and drive unmarked service vehicles for the past five years conducting anti-smuggling enforcement. My duties included developing criminal cases against illicit actors and their associates within criminal organizations. I have participated in the investigation of numerous criminal

2

smuggling entities, which required surveillance of static and mobile targets of interest. I have performed work on open investigations, developed target files, drafted administrative subpoenas and search warrant affidavits, and developed leads on suspects. In addition, I have queried various databases and reviewed subpoena returns, such as cell phone tolls, to identify criminal associates and smuggling organizations. The smuggling of non-citizens without legal status generates many types of evidence, including, but not limited to, cellular phone-related evidence such as voicemail messages, listed contacts, photographs, text and third-party chat messages (via SMS or other applications), and phone numbers of co-conspirators and illegal aliens. For example, drivers and passengers responsible for transporting the non-citizens without legal status are typically in telephonic contact with co-conspirators immediately prior to and/or following the crossing of the non-citizens without legal status at the border, at which time they receive instructions, including where to pick-up the non-citizens for transportation into the United States and where to take them after crossing into the United States. These communications may also include locations for delivery to stash houses and/or sponsors, as well as where and how to receive and transport payment following delivery. Non-citizens without legal status also are typically in telephonic contact with smugglers prior to and following their crossing in order to make smuggling arrangements, receive instructions, and report their locations after crossing. It is common for human smugglers to be in contact with co-conspirators weeks to months in advance of an event to recruit drivers and to coordinate the event. It is also common for co-conspirators to continue to contact each other by phone calls, social media, or messaging applications when contact is lost with the driver after an apprehension has occurred.

7.  Through my training and experience, I have gained working knowledge and insight into the typical workings of alien smuggling organizations. I have also gained

extensive knowledge as to the normal operational habits of persons involved in alien and bulk cash smuggling. Through the course of my training, investigations and conversations with other law enforcement personnel, I have become familiar with the behavior and methods of operations of alien smugglers to avoid detection and apprehension by law enforcement officers. Furthermore, I am aware that it is common practice for alien smugglers to facilitate movement of illegal aliens, to further their entry into the United States, using passenger vehicles, to include: personally owned and registered vehicles; rental vehicles; borrowed vehicles; stolen vehicles; or vehicles with no valid registration. Such vehicles are also used to transport and smuggle cash proceeds from the United States back to coordinators in Mexico.

8. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone. Specifically, searches of cellular telephones may yield evidence:

   a. tending to indicate efforts to transport non-citizens without legal status from outside the United States into and throughout the United States;

   b. tending to identify other facilities, storage devices, or services such as email addresses, IP addresses, and phone numbers that may contain electronic evidence of efforts to transport non-citizens without legal status from outside the United States into and throughout the United States, as well as evidence of the transportation of alien smuggling proceeds throughout the United States and into Mexico;

   c. tending to identify co-conspirators, criminal associates, or others involved in the transporting of non-citizens without legal status from outside the United States into and throughout the United States, and of alien smuggling proceeds throughout the United States and into Mexico;

   d. tending to identify travel to or presence at locations such as stash houses, load houses, or delivery points involved in the transporting of non-citizens without legal status from Mexico to the United States or throughout the

United States and transporting of alien smuggling proceeds throughout the United States and into Mexico;

e. tending to identify the user of, or persons with control over or access to, the subject phone; or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data above.

## FACTS SUPPORTING PROBABLE CAUSE

### The March 31, 2022 Event

9. On March 31, 2022, United States Border Patrol Agents J. Aguayo and R. Hagan were assigned traffic check duties on the Murrieta Smuggling Interdiction (SIG) Unit. The SIG Team is dedicated to conducting targeted enforcement and anti-smuggling operations within the Murrieta Border Patrol Stations area of responsibility. Agents routinely conduct their enforcement duties along the Interstate 15 smuggling corridor. This area is located approximately 70 miles north of the United States/ Mexico International Border and is a well-known and documented corridor used by illegal aliens and contraband smugglers to transport their cargo north into the interior of the United States. Non-citizens and contraband smugglers frequently use I-15 as it provides direct access to cities that serve as distribution centers for narcotics and smuggled aliens.

10. At approximately 10:02 am agents were travelling north on I-15 observing northbound traffic near Highway 76. Agents Aguayo and Hagan noticed a silver Jeep Grand Cherokee bearing CA plate 8TUK543 ("the Jeep") approach their position. Record checks revealed a recent Release of Liability to Israel Felix in San Diego, CA. It is not uncommon for alien smugglers to acquire vehicles and leave them under a Release of Liability rather than register the vehicle in their name.

5

11. The Jeep exited the freeway. The agents followed as it entered a known dead-end road, and observed the Jeep make a three-point turn. The agents pulled alongside the Jeep and asked the driver if he was lost. The driver seemed extremely nervous and could not answer the questions. Agent Aguayo stepped out of his vehicle and approached the Jeep's driver side window to talk with the driver. Agent Aguayo noticed a male individual that appeared to be hiding by lying down on the back seat. The individual appeared wet and sandy. The driver was later identified as Israel VALDEZ-Felix and the passenger as F.G.J.

12. Agent Aguayo questioned the individuals individually as to their citizenship. Each individual claimed to be a citizen and national of Mexico illegally present in the United States. VALDEZ stated that he entered the U.S. illegally approximately 5 months earlier. F.G.J. stated that he illegally entered the U.S. earlier that morning at Imperial Beach.

13. Agent Aguayo placed VALDEZ and F.G.J. under arrest for being illegally present in the United States. At the station, DHS databases revealed VALDEZ had several prior arrests for illegal entry and an expedited removal on December 17, 2017. Records also revealed VALDEZ had been arrested for alien smuggling in El Centro Sector on June 25, 2020. On March 31, 2022, VALDEZ was granted a voluntary return to Mexico by the Patrol Agent in Charge.

14. The Jeep was left on scene to be towed at VALDEZ's request.

**The June 3, 2022 Event**

15. On June 3, 2022, at approximately 10:45 a.m., while working routine criminal interdiction, Riverside Deputy Sheriff T. Peterson conducted a traffic stop on the Jeep on Interstate 15 northbound at Gopher Canyon Road, San Diego County, California. The

vehicle stop was for tinted windows. The driver, identified as Israel VALDEZ-Felix, was unlicensed. The car smelled of marijuana, dry vegetation, and brush. The vehicle had two rear seat passengers, both of whom admitted to illegally crossing the border and having been recently picked up by VALDEZ on a dirt road in a remote area.

16. The two passengers were from Honduras and Guatemala. They were disheveled with soiled clothing, twigs and brush on their person, and wet shoes and pant legs. They spoke Spanish and stated they did not have an exact idea of where they were going. VALDEZ stated he was traveling to a friend's house off Gopher Canyon Road but could not remember where. VALDEZ did not know the names or relationship of the passengers in his back seat.

17. The contact with VALDEZ was documented and pictures of his person and the Jeep were taken. The information was forwarded to Border Patrol as intelligence in reference to human trafficking. VALDEZ was directed to park his Jeep and the passengers were told they were free to leave if they chose to do so. Deputy Peterson explained to VALDEZ that if he was caught driving again without a license or engaged in criminal activity, Deputy Peterson would arrest him and tow his vehicle.

**The June 6, 2022 Event**

18. On June 6, 2022, at approximately 8:27 a.m., Oceanside Police Officer M. Pareneau conducted a traffic stop on a silver SUV for travelling 77 mph in a posted 55 mph zone in violation of state law. The driver, who had no identification on him, identified himself as Israel VALDEZ. VALDEZ appeared to only speak Spanish. VALDEZ contacted his fiancé via telephone who assisted in translation. VALDEZ's fiancé informed Officer Pareneau that VALDEZ had never been issued a license from any state or country

and that he was still in the process of obtaining a driver's license. Officer Pareneau determined VALDEZ was driving without a license in violation of state law.

19. VALDEZ was issued a citation for the above-mentioned violations and his vehicle was impounded per state code.

20. A copy of Officer Pareneau's body camera video was obtained and analyzed by me. I have reviewed numerous arrest photos of VALDEZ, as well as encounter photos from other law enforcement agencies. Based on my familiarity with VALDEZ's appearance gained from reviewing these photos, I identified VALDEZ in the video. The video depicts VALDEZ with three passengers in the vehicle at the time Officer Pareneau conducted the traffic stop. A clear screen shot of the front seat passenger was placed into the Department of Homeland Security (DHS) facial recognition system. The system identified one of the passengers as S.R.C., an 18-year-old Guatemalan citizen who was arrested attempting to enter the United States illegal on February 15, 2021, in the Border Patrol's Tucson Sector. Subsequent checks revealed S.R.C. had not made any attempt to obtain documents to allow him to enter or remain in the United States legally.

**The July 5, 2022 Event**

21. On July 5, 2022, Riverside Deputy Sheriff Peterson was working criminal interdiction in the Counties of Riverside and San Diego, California. At approximately 10:40 a.m., Deputy Peterson was southbound on Interstate 15, in a marked Sheriff's Tahoe, approaching Deer Springs when Deputy Peterson observed a Jeep, traveling in the same direction. The vehicle had tint, possibly in violation of state law. Deputy Peterson inquired about the plate. Based on information from the DMV and Border Patrol, Deputy Peterson believed the vehicle he was observing on July 5th was the same Jeep he stopped VALDEZ driving on June 3, 2022. Deputy Peterson checked the vehicle plate via License Plate

Readers (LPRs) and learned the Jeep traveled north earlier that morning. The Jeep was previously captured on cameras in an area known as a route used to bypass the Border Patrol's Murietta check point. Deputy Peterson then drove next to the Jeep and looked inside. Deputy Peterson immediately recognized the driver as VALDEZ. Based on his prior interaction with VALDEZ, Deputy Peterson believed VALDEZ was unlicensed. He further knew VALDEZ to be involved in human smuggling.

22. Deputy Peterson initiated a traffic stop for the window tint and operating a motor vehicle while unlicensed. After about ¼ of a mile, the Jeep yielded at the Deer Springs off ramp exit. Deputy Peterson approached the passenger side widow and contacted the driver, VALDEZ. Deputy Peterson immediately smelled the odor of smoked marijuana and observed marijuana on the center console area along with vape pens commonly associated with THC ingestion. Deputy Peterson had VALDEZ hang up his phone (later identified by me from the body worn camera video as **Target Device 1**) and exit the vehicle. Deputy Peterson reminded VALDEZ that Deputy Peterson would arrest VALDEZ if he caught VALDEZ driving without a license again or committing criminal activity. Though less than an ounce of marijuana is legal to possess in California, it is not legal to use while driving or to possess and manipulate in an open container. Based on his training and experience, Deputy Peterson believed VALDEZ was using, possessing and manipulating the marijuana while operating a motor vehicle.

23. Deputy Peterson patted VALDEZ down and removed VALDEZ's wallet from his person. Deputy Peterson then placed VALDEZ into the rear of his unit. Deputy Peterson checked VALDEZ's wallet and observed a thick bundle of cash inside that was later counted and confirmed to be approximately $3,592.00.

24. Deputy Peterson returned to the Jeep and continued the search for the marijuana source and to process the vehicle for towing. Deputy Peterson opened the center console and immediately located four thick bundles of United States Currency, all $100 bills, which was later counted and confirmed to be $40,000. Deputy Peterson now believed, based on his training and experience, coupled with his specific knowledge of VALDEZ, that VALDEZ was involved in bulk cash smuggling. When Deputy Peterson previously spoke to VALDEZ a month earlier, VALDEZ was unemployed and had no source of income but had currency on his person.

25. Deputy Peterson notified his partners of the items located. Deputy Peterson then briefly spoke to VALDEZ to find out the origin of the currency. VALDEZ spoke in broken English. However, VALDEZ was able to comply with Deputy Peterson's requests, which were made in English. VALDEZ stated the money was from his mom but also going to his mom, who resided in Tijuana. Deputy Peterson asked VALDEZ if he could have the names and or phone numbers of the people who gave him the currency. VALDEZ told Deputy Peterson he did not understand the questions. Deputy Peterson asked several times and VALDEZ gave Deputy Peterson a blank stare and acted as if he did not understand Deputy Peterson.

26. Deputy Peterson searched the vehicle and located, among other things, about 15 grams of marijuana buds in a container under the front seat and THC vape pens in the map pouch, center console, and floor with marijuana debris. Deputy Peterson also located a cell phone (later identified by me from the body worn camera video as Target Device 2) in the center console and a dollar bill with cocaine in it on the floorboard behind the front passenger's seat.

27. After being contacted by Deputy Peterson, DEA TFO Investigator M. Callahan and Special Agent I. Rodriguez with DEA Riverside conducted an audio recorded interview of VALDEZ for a narcotics nexus. VALDEZ waived his Miranda rights and agreed to speak to the agents. SA Rodriguez served as a Spanish translator. VALDEZ stated he was involved in smuggling aliens, including on July 5, 2022. VALDEZ gave the agents access to **Target Device 1**. VALDEZ identified multiple location pinpoints on Target Device 1 used to direct him to locations to pick up subjects who illegally entered the U.S. VALDEZ stated the $40,000 in the vehicle was given to him from the same subject who paid him $3,600. VALDEZ further stated the money was going to a source in Mexico. VALDEZ stated it was his third trip with currency. VALDEZ claimed he would travel to National City and give the money to another subject who then transported it into Mexico.

28. Deputy Peterson transported VALDEZ to the Murrieta Border Patrol Station for further investigation and seizure of the criminal proceeds. The U.S. Border Patrol took custody of VALDEZ, the currency, **Target Devices**, and relevant evidence.

29. On July 5, 2022, at approximately 6:55 p.m., VALDEZ waived his Miranda rights and agreed to speak to Border Patrol Agents - without an attorney present. VALDEZ was interviewed in Spanish. VALDEZ stated he was residing with his girlfriend and her parents on Orange Avenue in Chula Vista, California. VALDEZ said he made an illegal entry into the United States approximately four months prior after being removed from the United States. He stated he was previously arrested by Border Patrol for smuggling aliens. After his arrest he was removed from the United States. He made an illegal entry near the Otay Mesa Port of Entry (POE). VALDEZ claimed he paid $5,000 to be smuggled into the

United States. VALDEZ stated the organization he is working for smuggled him into the United States.

30. Regarding the events of that day, July 5, 2022, VALDEZ said he transported four non-citizens to Perris, California at approximately 5:00 a.m. After dropping off the non-citizens, VALDEZ was paid approximately $3,600. He was then instructed to transport $40,000 to Chula Vista, California. VALDEZ was traveling to the Chula Vista Center Mall, located at 525 H Street Chula Vista, California to deliver the $40,000 to an unidentified Hispanic male (UHM) when he was stopped by Deputy Peterson. VALDEZ admitted to picking up the money from an UHM in Perris, California. VALDEZ stated the $40,000 were alien smuggling proceeds.

31. VALDEZ admitted to smuggling non-citizens on five previous occasions. VALDEZ also admitted to getting paid $600-$700 for each non-citizen. VALDEZ claimed he met with unidentified individuals who provided him with the non-citizens to transport and VALDEZ picked up the non-citizens near a jail in Otay Mesa, California.

32. During the interview, VALDEZ identified the **Target Devices** as his and signed written consent forms in Spanish allowing agents to search both phones. VALDEZ provided the pass code to **Target Device 1**. Since the seizure, VALDEZ has made no attempt to revoke his consent. The Border Patrol Asset Forfeiture Office (AFO) has made two attempts by mail to contact VALDEZ regarding the forfeiture of the **Target Devices**. The first notice was returned and there has been no response to date to the second attempt.

33. Based upon my experience and training, consultation with other law enforcement officers experienced in human smuggling investigations, and all the facts and opinions set forth in this affidavit, I believe that telephone numbers, contact names, electronic mail (email) addresses, appointment dates, messages, pictures, and other digital

information are stored in the memory of the **Target Devices**. In light of the above facts and my experience and training, there is probable cause to believe that VALDEZ was using the **Target Devices** to communicate with others to further the conspiracy to transport certain aliens into and throughout the United States and to aid and abet in bulk cash currency smuggling. Based on my training and experience, it is also not unusual for individuals, such as VALDEZ, to attempt to minimize the amount of time they were involved in their smuggling activities, and for the individuals to be involved for weeks and months longer than they claim. Accordingly, I request permission to search the **Target Devices** for data beginning on February 28, 2022 (approximately one month before the March 31, 2022, alien smuggling event), through July 5, 2022 (the date of VALDEZ' most recent arrest).

## METHODOLOGY

34. It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of

the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

35. Following the issuance of this warrant, a case agent familiar with the investigation will collect the subject cellular telephone and subject it to analysis. All forensic analysis of the data contained within the telephone and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

36. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within 90 days from the court's signing of the warrant, absent further application to this court.

//
//
//
//
//
//
//

14

## CONCLUSION

Based on the facts and information set forth above, there is probable cause to believe that a search of the **Target Devices** will yield evidence of violations of Title 8, United States Code, Sections 1324(a)(1)(A)(ii)(transportation of certain aliens) and (v)(I) (conspiracy to transport certain aliens), Title 31, United States Code, Section 5332 (bulk cash smuggling), and Title 18, United States Code, Section 2 (aiding and abetting). Accordingly, I request that the Court issue a warrant authorizing law enforcement to search the items described in Attachments A-1 and A-2, and seize the items listed in Attachment B using the above described methodology.

I swear the foregoing is true and correct to the best of my knowledge and belief.

_Alexander Djokich_
Alexander Djokich
Border Patrol Agent

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 27th day of September 2022.

_____
Hon. Andrew G. Schopler
United States Magistrate Judge